**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 18-38C |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

# AMENDED COMPLAINT

The State of South Carolina (South Carolina or State) sets forth and complains as follows:

## <u>INTRODUCTION</u>

1.      After protracted discussions and negotiations from 2001 through 2003, South Carolina agreed to accept shipments of surplus, weapons-grade defense plutonium into the State in furtherance of the United States' nuclear weapons and waste policy in reliance on the explicit commitment and obligation of the United States and the United States Department of Energy (DOE)[1] to remove the plutonium through processing or otherwise to prevent South Carolina from becoming a *de facto* permanent repository of nuclear waste.

2.      Because of concerns that the United States and DOE would renege on their obligations and fail to implement a disposition strategy, leaving South Carolina as the permanent dumping ground for weapons-grade defense plutonium, the United States' commitments were codified in Section 2566 of Title 50 of the United States Code (Section 2566) to ensure the enforceability of these obligations against the United States and its agencies and officers.

---

[1] As used herein, DOE is inclusive of its semi-autonomous agency under its rubric, the National Nuclear Security Administration (NNSA), and their respective officials.

3.      As one of the codified commitments in Section 2566, as amended, Congress

mandated that, upon failure to achieve certain milestones, the United States Secretary of Energy

(Secretary) and DOE shall, beginning January 1, 2016, provide $1 million per day economic and

impact assistance payments to South Carolina for each day they fail to remove from the State one

metric ton of weapons-grade defense plutonium during the first 100 days of each of the years 2016

through 2021.

4.      Unfortunately, proving accurate the prior concerns expressed by the State, the

Secretary and DOE have ignored their statutory mandates and commitments to the State and have

failed to process or remove weapons-grade defense plutonium in accordance with Section 2566 or

provide any of the economic and impact assistance payments owed to South Carolina.

5.      This lawsuit seeks the recovery of the $200 million the United States currently owes

South Carolina for the economic and impact assistance payments that DOE has failed and refused

to pay for calendar years 2016 and 2017.

## JURISDICTION

6.      This Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C.A.

§ 1491, because Section 2566(d)(1) is a money-mandating statute providing that, when certain

conditions are met, the Secretary and DOE "shall pay" the amount specified by the statute.

7.      In February 2016, the State filed a lawsuit in the United States District Court,

District of South Carolina, pursuant to the Administrative Procedures Act (APA), asserting, in

part, a cause of action for declaratory and injunctive relief for the payment of the economic and

impact assistance payments owed for 2016 pursuant to Section 2566(d)(1). *See State of South

Carolina v. United States et al.*, C/A No. 1:16-cv-00391-JMC. By order dated February 7, 2017,

the District Court dismissed this cause of action without prejudice to the ability of the State to

prosecute it as an original action in this Court.  *South Carolina v. United States*, 2017 WL 491696 (D.S.C. Feb. 7, 2017). Pursuant to Rule 9(p) of this Court's rules (RCFC), the State asserts that this prior litigation has no effect on this Court's subject matter jurisdiction.

## **PARTIES**

8.      South Carolina is a sovereign state of the United States and home to the Savannah River Site (SRS), which borders the Savannah River and covers approximately 310 square miles, encompassing parts of Aiken, Barnwell, and Allendale counties. Several of DOE's plutonium disposition facilities are located at SRS, including the mixed oxide (MOX) fuel fabrication facility (MOX Facility) currently under construction. Congress has declared that "the State of South Carolina [has] a compelling interest in the safe, proper, and efficient operation of the plutonium disposition facilities at the Savannah River Site." Bob Stump National Defense Authorization Act for Fiscal Year 2003 (NDAA FY03), Pub. L. No. 107-314, 116 Stat. 2458, Subtitle E, § 3181. Furthermore, Congress has declared that "the MOX facility will also be economically beneficial to the State of South Carolina, and that economic benefit will not be fully realized unless the MOX facility is built." *Id.* DOE and NNSA also have exclaimed that "South Carolina plays a vital role in our efforts to reduce the threat of nuclear terrorism by supporting the safe and secure handling of nuclear materials and preparing them for disposal" and that "[t]he SRS community performs an invaluable service that is not currently possible anywhere else in the world." Ex. 1, "Plutonium Disposition Factsheet."

9.      Defendant is the United States of America. DOE is an Executive Agency of the United States government and is responsible for, among other things, the administration of federal programs concerning the production of nuclear materials for the weapons program and their storage and disposition. *See* 42 U.S.C.A. §§ 7111 *et seq*. DOE is the owner of SRS. The Secretary

is responsible for the administration, operations, and activities of DOE, including the administration of programs related to the MOX Facility at SRS. NNSA is a separately organized agency within the DOE created by Congress in 2000. 50 U.S.C.A. § 2401. NNSA generally is responsible for the nation's nuclear weapons, nonproliferation, and naval reactors programs, *id.,* and specifically administers and manages activities related to the MOX Facility.

## **GOVERNING LAW**

### *Section 2566*

10.     Section 2566 of the Atomic Energy Defense Provisions, entitled, "Disposition of Weapons-Usable Plutonium at Savannah River Site" sets forth the Congressional mandate for the "construction and operation of [the MOX Facility]" and achievement of the "MOX productive objective." 50 U.S.C.A. § 2566(a).

11.     Section 2566(h) defines the "MOX production objective" as meaning:

> production at the MOX facility of mixed-oxide fuel from defense plutonium and defense plutonium materials at an average rate equivalent to not less than one metric ton of mixed-oxide fuel per year. The average rate shall be determined by measuring production at the MOX facility from the date the facility is declared operational to the Nuclear Regulatory Commission through the date of assessment.

50 U.S.C.A. § 2566(h)(2).

12.     Pertinent here, Section 2566(d)(1) states:

> If the MOX production objective is not achieved as of January 1, 2016, the Secretary shall, subject to the availability of appropriations, pay to the State of South Carolina each year beginning on or after that date through 2021 for economic and impact assistance an amount equal to $1,000,000 per day, not to exceed $100,000,000 per year, until the later of—

> > (A) the date on which the MOX production objective is achieved in such year; or

> (B) the date on which the Secretary has removed from the State of South Carolina in such year at least 1 metric ton of defense plutonium or defense plutonium materials.

50 U.S.C.A. § 2566(d)(1).

# BACKGROUND AND FACTS

## *SRS and the MOX Facility Project.*

13.     Built in the 1950s, the United States and DOE-owned SRS "processes and stores nuclear materials in support of national defense and U.S. nuclear nonproliferation efforts" through several programs or "missions." DOE Office of Environmental Management Website, *Savannah River Site*, http://energy.gov/em/savannah-river-site (last visited March 5, 2018). DOE identifies SRS as "a key [DOE] industrial complex responsible for environmental stewardship, environmental cleanup, waste management and disposition of nuclear materials." *Id.*

14.     SRS also serves as the construction site for DOE's MOX Facility, which DOE and NNSA previously identified as the "cornerstone of the surplus disposition mission." Ex. 2, DOE, *SPD Supplemental EIS* factsheet (July 19, 2012). "This mission, which converts excess weapons-usable plutonium into a form that can be used in commercial nuclear power reactors, establishes SRS's vital role in plutonium management for DOE." *Id.*

## *The United States develops a policy and plan for weapons-grade plutonium disposition.*

15.     With the end of the Cold War and the collapse of the Soviet Union, significant quantities of nuclear weapons, including large amounts of weapons-grade plutonium, became surplus to the defense needs of the United States and Russia. Control of these surplus materials became an urgent U.S. foreign policy goal. Particular concern focused on plutonium from Soviet nuclear warheads, which the United States feared posed a major nuclear weapons proliferation risk.

16.     In an effort to consolidate and eventually reduce the United States' and Russia's surplus weapons-grade plutonium, the United States and Russia jointly developed a plan for the nonproliferation of weapons of mass destruction worldwide. *See* Ex. 3, Excerpt from D.J. Spellman *et al.*, *History of the U.S. Weapons-Usable Plutonium Disposition Program Leading to DOE's Record of Decision* 2 (1997) (detailing important events and studies concerning surplus weapons-usable plutonium disposition in United States from end of Cold War to 1997).

17.     Consistent with this joint plan, in the early 1990s, the United States began exploring options for the long-term storage and the safe disposition of weapons-usable plutonium declared surplus to national security needs. *Id*. Congress tasked DOE with the responsibility of developing and implementing a plan to dispose of the Nation's weapons-grade plutonium, subject to legislative approval, and DOE conducted numerous studies of plutonium disposition strategies.

18.     After evaluating various disposition technology options, DOE concluded in 1996 that the "preferred alternative" consisted of a dual-path strategy that proposed (1) immobilization of a portion of the surplus plutonium in glass or ceramic materials and (2) irradiation of the remaining plutonium in mixed oxide (MOX) fuel. Ex. 4, *Report to Congress: Disposition of Surplus Defense Plutonium at Savannah River Site (Feb. 15, 2002) (Report to Congress)*.

19.     The following year, DOE announced its intention to pursue this strategy, including the construction and operation of a MOX fuel fabrication facility. *Id*. at 2-1.

20.     Then, in January 2000, DOE announced its decision to construct and operate the MOX Facility at SRS to fabricate MOX fuel using approximately 34 metric tons of surplus plutonium. Ex. 5, DOE, Excerpt from *Surplus Plutonium Disposition Final Environmental Impact Statement* (*SPD EIS*), Vol. I – Part A, at 1-10 to 1-11; *see also* Ex. 6, DOE, *ROD for SPD EIS*

(Jan. 11, 2000), 65 Fed. Reg. 1608 (announcing decision to construct and operate MOX Facility at SRS).

21.     Contemporaneous with the development of this disposition strategy was the negotiation of an agreement with Russia committing each country to the disposal of surplus weapons-grade plutonium. In September 2000, the United States and Russia formally entered into the Plutonium Management and Disposition Agreement (PMDA) obligating both sides to dispose of at least 34 metric tons of weapons-grade plutonium. *See* Ex. 7, PMDA.

22.     In late 2001, Congress enacted the National Defense Authorization Act for Fiscal Year 2002, Pub. L. No. 107-107, 115 Stat. 1378 (NDAA FY02). Section 3155 of NDAA FY02 was entitled "Disposition of Surplus Defense Plutonium at Savannah River Site, Aiken, South Carolina" and directed DOE to provide, not later than February 1, 2002, a plan for the disposal of surplus defense plutonium located at SRS and to be shipped to SRS in the future. These statutory provisions also required the Secretary to:

- Consult with the Governor of South Carolina regarding "any decisions or plans of the Secretary related to the disposition of surplus defense plutonium and defense plutonium materials located at [SRS]";
- Submit a report to the congressional defense committees providing notice for each shipment of defense plutonium and defense plutonium materials to SRS;
- If DOE decides not to proceed with construction of the immobilization facilities or the MOX Facility, prepare a plan that identifies a disposition path for all defense plutonium and defense plutonium materials; and
- Include with the budget justification materials submitted to Congress in support of DOE's budget for each fiscal year "a report setting forth the extent to which amounts requested for the [DOE] for such fiscal year for fissile materials disposition activities will enable the [DOE] to meet commitments for the disposition of surplus defense plutonium and defense plutonium materials located at [SRS]…."

### DOE moves to a MOX-only approach for plutonium disposition.

23.    Despite the earlier commitment to a dual-path strategy, DOE announced in January 2002 that it was abandoning the immobilization portion of the strategy, leaving the construction and operation of the MOX Facility as the only option to dispose of surplus defense plutonium in the United States. Ex. 8, DOE, Release No. PR-02-007 (Jan. 23, 2002).

24.    In February 2002, DOE reported to Congress its conclusion that moving to the MOX-only approach was the "preferred option" and advocated for construction of the MOX Facility at SRS. Ex. 4, *Report to Congress* 5-6 ("MOX is the most advantageous approach to disposition U.S. surplus plutonium.").

25.    Regarding the options for long-term storage of plutonium, DOE reported to Congress that "[s]torage in place undercuts existing commitments to the states, particularly South Carolina, which is counting on disposition as a means to avoid becoming the permanent 'dumping ground' for surplus weapons-grade plutonium by providing a pathway out of the site for plutonium brought there for disposition." *Id.* at 5-2.

### In 2001-2002, DOE has an urgent need to ship plutonium to South Carolina.

26.    DOE also had a pressing need in 2001 and 2002 to ship plutonium to SRS from DOE's Rocky Flats facility in Utah so that it could close that facility by 2006. Ex. 4, *Report to Congress* 5-8; Ex. 9, Aff. of Jessie Hill Roberson (ECF No. 10) at ¶¶4-6, dated May 24, 2002, *Hodges v. Abraham*, 1:02-cv-01426-CMC.

27.    By quickly shipping plutonium to South Carolina, DOE would achieve significant cost savings. DOE stated at the time that the transfer of the plutonium stored at Rocky Flats to SRS would save DOE approximately $1 million per day that could then be used for cleanup work at the Rocky Flats facility. Ex. 9, Aff. of Jessie Hill Roberson at ¶18.

28.     DOE also stated that the failure to quickly remove the plutonium from the Rocky Flats would "place in jeopardy DOE's ability to close the site by the end of 2006." *Id.* at ¶11. According to DOE, "[f]ailure to carry out this strategy at Rocky Flats would call into question DOE's ability to clean up and close a major weapons production site. DOE's ability to effectively establish near-term cleanup priorities in furtherance of long-term complex-wide objectives would be seriously, and perhaps irreparably, damaged." *Id.* at ¶10.

### *South Carolina's Governor negotiates to protect the State.*

29.     DOE's shift to the MOX-only approach combined with DOE's decision to ship plutonium from Rocky Flats to SRS without any deadlines for the processing or removal of that plutonium from South Carolina greatly concerned the State.

30.     Then-South Carolina Governor Jim Hodges raised these concerns to then-DOE Secretary Spencer Abraham and, over the course of several months in 2001 and 2002, the State and DOE, through Governor Hodges and Secretary Abraham, negotiated to reach an agreement that would allow DOE to ship the Rocky Flats plutonium to South Carolina in exchange for DOE's commitment to maintain a pathway out of South Carolina for the plutonium.

31.     As part of these negotiations, Governor Hodges—in what can only be considered prescient foresight—"insist[ed] upon an ironclad agreement that is fully enforceable in a court of law," informing DOE that "[t]he stakes are too high to accept mere political assurances. I will not risk the health and welfare of South Carolina by allowing the enforceability of any agreement to be bound only by federal departmental policy that changes according to political considerations beyond our control." *Id.* Ex. 10, Ltr. of Hodges to Abraham, dated April 10, 2002.

32.     In response, DOE offered five commitments:

    1.     A commitment to construct two facilities at SRS, including milestones;

2.      A commitment by the Department of Energy, backed up by language in the President's FY 03 budget, to request all needed funds to carry out this program at Savannah River . . . ;

3.      The establishment of annual funding targets;

4.      A commitment to notify the State of all plutonium shipments into South Carolina; and

5.      A commitment to maintain a pathway out of South Carolina for any plutonium brought into the State, including firm dates by which such material would be removed from the State if DOE, for any reason, were to be unable to secure the funding necessary to build the MOX facility.

Ex. 11, Ltr. of Abraham to Hodges, dated April 11, 2002.

33.      Importantly, Secretary Abraham and DOE also committed to supporting federal legislation that codified these commitments. *Id*.

### *The United States' commitments to South Carolina are codified.*

34.      In April 2002, the Honorable Pietro (Pete) V. Domenici, then-United States Senator for the State of New Mexico, discussing the agreement to locate the MOX Facility in South Carolina to comply with the PMDA, acknowledged the assurance received by South Carolina from the United States and DOE as a full guarantee to the MOX Facility:

Now, South Carolina is hesitating. The plutonium disposition agreement is being imperiled by the unwillingness of the State of South Carolina to reach an agreement with the Department of Energy on taking shipment of the plutonium identified for disposition and building the required facilities.

It is appropriate for the Governor of South Carolina to insist on every assurance that his State will be treated fairly, and will not simply become the permanent storage site for unwanted nuclear material if for some reason the plutonium agreement should fall apart.
. . . .
The Governor has gotten the Secretary of Energy to provide South Carolina all of the assurances they never got from the Clinton administration, including full funding for the MOX program, a strict construction schedule, and a number of mechanisms, including

statutory language and other measures, to ensure that the agreement
will be legally enforceable.

Congressional Record (Senate), 148 Cong. Rec. S2820-03, 2002 WL 571890, 107th Congress,

Second Session (April 17, 2002) (emphasis added).

35.    Congress enacted statutory requirements for DOE's construction and operation of

the MOX Facility. *See* NDAA FY03, Pub. L. No. 107-314, 116 Stat. 2458, Subtitle E, § 3182,

*subsequently codified by* National Defense Authorization Act for Fiscal Year 2004 (NDAA FY04),

Pub. L. No. 108-136, 117 Stat. 1392, as 50 U.S.C.A. § 2566.

36.    In support of these requirements, Congress found:

(5) The United States and the State of South Carolina have a
compelling interest in the safe, proper, and efficient operation of the
plutonium disposition facilities at the Savannah River Site. The
MOX facility will also be economically beneficial to the State of
South Carolina, and that economic benefit will not be fully realized
unless the MOX facility is built.

(6) The State of South Carolina desires to ensure that all plutonium
transferred to the State of South Carolina is stored safely; that the
full benefits of the MOX facility are realized as soon as possible;
and, specifically, that all defense plutonium or defense plutonium
materials transferred to the Savannah River Site either be processed
or be removed expeditiously.

NDAA FY03, Subtitle E, § 3181.

37.    Section 2566 provides the Congressional mandate for the "construction and

operation of [the MOX Facility]" and requires DOE to achieve the "MOX production objective"

by producing mixed-oxide fuel from defense plutonium and defense plutonium materials at an

average rate of no less than one metric ton of mixed-oxide fuel per year. 50 U.S.C.A. § 2566(a),

(h).

38.    Section 2566 also requires "a schedule of operations of the [MOX Facility]

designed so that 34 metric tons of defense plutonium and defense plutonium materials at the

Savannah River Site will be processed into mixed-oxide fuel by January 1, 2019." 50 U.S.C.A. § 2566(a)(2)(B).

39.     In the event the MOX Facility construction or operations fell behind schedule, Congress directed DOE to develop a corrective action plan addressing any deficiencies and continuing the MOX Facility's construction to allow plutonium to be removed from SRS. 50 U.S.C.A. § 2566(b), (c).

40.     Section 2566 also imposed specific deadlines for the removal of defense plutonium and defense plutonium materials from South Carolina as well as, at issue in this case, the provision of economic and impact assistance payments to the State should the MOX production objective not be achieved. 50 U.S.C.A. § 2566(c), (d).

### *South Carolina lives up to its end of the agreement, but DOE turns its back on the MOX Facility and reneges on the commitments to the State of South Carolina.*

41.     Beginning shortly after the enactment of Section 2566 in 2002 and lasting through 2012, DOE shipped significant amounts of plutonium and plutonium materials to South Carolina from multiple other DOE facilities on the pretense that the plutonium was being consolidated at SRS for processing by the MOX Facility and other facilities for eventual disposition outside of South Carolina.

42.     In accordance with and in fulfillment of its agreement with DOE, South Carolina did not oppose any of these shipments or seek to prevent DOE from consolidating these dangerous materials at SRS.

43.     Nevertheless, DOE and NNSA have continuously sought to undermine the construction of the MOX Facility by not seeking sufficient funds to complete the project and actively seeking to terminate the project and have disregarded the United States' commitments to the State.

44.     Accordingly, on September 4, 2015, South Carolina Attorney General Alan Wilson

sent a letter to then-DOE Secretary Ernest Moniz. Ex. 12, Ltr. of Att'y General Wilson to Secretary

Moniz, dated Sept. 4, 2015. The letter stated in part:

> I have watched with great concern over the last year and a half as
> the highest level advisors and senior administrative staff at DOE and
> its National Nuclear Security Administration (NNSA) have
> continued to conspire to terminate the MOX Project. Even more
> troubling, I have learned that the DOE will attempt once again take
> action to halt construction of the MOX Facility despite its statutory
> obligations, international obligations, and the Congressional
> directive to continue construction, and further to do so without any
> viable alternative for the disposition or removal from South Carolina
> of the plutonium stored at SRS. I further understand that DOE
> officials have openly and repeatedly discounted DOE's statutory
> obligations to South Carolina.
>
> I reiterate the importance of the MOX Facility and encourage you to
> carefully consider the commitments the United States has made to
> the State of South Carolina. I would appreciate your assurance that,
> despite all current indications, DOE will abide by its legal duties,
> Congressional directives, and meet its statutory obligations to South
> Carolina. Unfortunately, in light of DOE and NNSA actions and
> inactions, there is little confidence in the State that these legal
> obligations will be honored.

*Id.* at 1-2. DOE and NNSA did not respond to the letter.

45.     DOE has not achieved the MOX production objective and, during the first 100 days

of calendar year 2016 and the first 100 days of calendar year 2017, failed to remove at least one

metric ton of defense plutonium or defense plutonium materials from the State or provide the

economic and impact assistance payments required by Section 2566(d)(1).

## CLAIMS FOR RELIEF

### COUNT ONE
**(Violations of Section 2566(d), Statutory Mandates, and Statutory Authority)**

46.     The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this cause of action.

47.     Section 2566(d)(1) states:

> If the MOX production objective is not achieved as of January 1, 2016, the Secretary shall, subject to the availability of appropriations, pay to the State of South Carolina each year beginning on or after that date through 2021 for economic and impact assistance an amount equal to $1,000,000 per day, not to exceed $100,000,000 per year, until the later of—
>
>> (A) the date on which the MOX production objective is achieved in such year; or
>>
>> (B) the date on which the Secretary has removed from the State of South Carolina in such year at least 1 metric ton of defense plutonium or defense plutonium materials.

50 U.S.C.A. § 2566(d)(1).

48.     DOE has not achieved the MOX production objective.

49.     DOE failed to remove at least one metric ton of defense plutonium or defense plutonium materials from the State during the first 100 days of calendar year 2016.

50.     DOE had appropriations legally available to make the statutorily-required economic and impact assistance payments to the State.

51.     The Consolidated Appropriations Act of 2016, Public Law No. 114-113 (2016 CAA), was enrolled as law on December 18, 2015, and was in effect for fiscal year 2016.

52.     Title III of Division D of the 2016 CAA, under the general heading of "Atomic Energy Defense Activities," contained the following appropriation account for "Defense Nuclear Nonproliferation":

> For Department of Energy expenses, including the purchase, construction, and acquisition of plant and capital equipment and other incidental expenses necessary for defense nuclear nonproliferation activities, in carrying out the purposes of the Department of Energy Organization Act (42 U.S.C. 7101 et seq.), including the acquisition or condemnation of any real property or any facility or for plant or facility acquisition, construction, or expansion, $1,940,302,000, to remain available until expended.

53.     Included within the "Defense Nuclear Nonproliferation" appropriation account were appropriations for DOE and NNSA's "Global material security," "Material management and minimization," "Nonproliferation and arms control," "Defense nuclear nonproliferation R&D," and "Nonproliferation construction" programs. Ex. 13, 2016 CAA Explanatory Statement.

54.     Except for the amounts appropriated for MOX Facility construction, the 2016 CAA did not prohibit the utilization of the authorized and appropriated "Defense Nuclear Nonproliferation" funds for payment of the economic and impact assistance to the State required by Section 2566.

55.     In addition to the "Defense Nuclear Nonproliferation" appropriation account and its programs and subprograms, the 2016 CAA contained, also under the general heading of "Atomic Energy Defense Activities," the following "Defense Environmental Cleanup" appropriation account:

> For Department of Energy expenses, including the purchase, construction, and acquisition of plant and capital equipment and other expenses necessary for atomic energy defense environmental cleanup activities in carrying out the purposes of the Department of Energy Organization Act (42 U.S.C. 7101 et seq.), including the acquisition or condemnation of any real property or any facility or for plant or facility acquisition, construction, or expansion, and the

> purchase of not to exceed one fire apparatus pumper truck and one
> armored vehicle for replacement only, $5,289,742,000, to remain
> available until expended: *Provided*, That of such amount
> $281,951,000 shall be available until September 30, 2017, for
> program direction.

56.    Included within the "Defense Environmental Cleanup" appropriation account are

appropriations for each of DOE's complexes and sites and their related programs, including SRS.

57.    The 2016 CAA does not prohibit the utilization of the authorized and appropriated

"Defense Environmental Cleanup" funds for payment of the economic and impact assistance to

the State required by Section 2566.

58.    Also contained within the 2016 CAA under the general heading of "Atomic Energy

Defense Activities" is the following appropriation account for "Other Defense Activities":

> For Department of Energy expenses, including the purchase,
> construction, and acquisition of plant and capital equipment and
> other expenses, necessary for atomic energy defense, other defense
> activities, and classified activities, in carrying out the purposes of
> the Department of Energy Organization Act (42 U.S.C. 7101 et
> seq.), including the acquisition or condemnation of any real property
> or any facility or for plant or facility acquisition, construction, or
> expansion, $776,425,000, to remain available until expended:
> *Provided*, That of such amount, $249,137,000 shall be available
> until September 30, 2017, for program direction.

59.    The 2016 CAA does not prohibit the utilization of the authorized and appropriated

"Other Defense Activities" funds for payment of the economic and impact assistance to the State

required by Section 2566.

60.    Upon information and belief, in addition to the 2016 CAA appropriations, DOE

had other available legally available appropriations for payment of the economic and impact

assistance to the State required by Section 2566, including carryover funds from prior year

appropriations, also known as "uncosted unencumbered balances," which generally remain

available until expended.

61.     Despite having legally available appropriations, DOE has failed and refused to provide any of the economic and impact assistance payments to the State.

62.     DOE's failure to provide the economic and impact assistance payments to the State is a clear violation of Section 2566, and the State has been harmed by this failure.

63.     The State therefore is entitled to full payment of an amount equal to $1 million per day in economic and assistance payments owed for the first 100 days of 2016.

## COUNT TWO
### (Violations of Section 2566(d), Statutory Mandates, and Statutory Authority)

64.     The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this cause of action.

65.     Section 2566(d)(1) states:

> If the MOX production objective is not achieved as of January 1, 2016, the Secretary shall, subject to the availability of appropriations, pay to the State of South Carolina each year beginning on or after that date through 2021 for economic and impact assistance an amount equal to $1,000,000 per day, not to exceed $100,000,000 per year, until the later of—
>
> > (A) the date on which the MOX production objective is achieved in such year; or
> >
> > (B) the date on which the Secretary has removed from the State of South Carolina in such year at least 1 metric ton of defense plutonium or defense plutonium materials.

50 U.S.C.A. § 2566(d)(1).

66.     DOE has not achieved the MOX production objective.

67.     DOE failed to remove at least one metric ton of defense plutonium or defense plutonium materials from the State during the first 100 days of calendar year 2017.

68.     DOE had appropriations legally available to make the statutorily-required economic and impact assistance payments to the State.

69.     For the first several months of fiscal year 2017, most federal agencies, including DOE, were funded through several continuing resolutions passed by Congress. Specifically, Congress passed three continuing resolutions to provide for fiscal year 2017 appropriations from October 1, 2016 through May 5, 2017, for federal agencies to continue projects or activities at the levels of, and under the terms and conditions of 2016 CAA.

70.     The Consolidated Appropriations Act of 2017, Public Law No. 115-31 (2017 CAA), was enrolled as law on May 5, 2017.

71.     Title III of Division D of the 2017 CAA, under the general heading of "Atomic Energy Defense Activities," contains the following appropriation account for "Defense Nuclear Nonproliferation":

> For Department of Energy expenses, including the purchase, construction, and acquisition of plant and capital equipment and other incidental expenses necessary for defense nuclear nonproliferation activities, in carrying out the purposes of the Department of Energy Organization Act (42 U.S.C. 7101 et seq.), including the acquisition or condemnation of any real property or any facility or for plant or facility acquisition, construction, or expansion, $1,902,000,000, to remain available until expended: *Provided*, That of the unobligated balances from prior year appropriations available under this heading that were apportioned in Category C (defined in section 120 of Office of Management and Budget Circular No. A–11), $19,128,000 is hereby rescinded: *Provided further*, That no amounts may be rescinded from amounts that were designated by the Congress as an emergency requirement pursuant to a concurrent resolution on the budget or the Balanced Budget and Emergency Deficit Control Act of 1985.

72.     Included within "Defense Nuclear Nonproliferation" appropriation account are appropriations for DOE and NNSA's "Global material security," "Material management and

minimization," "Nonproliferation and arms control," "Defense nuclear nonproliferation R&D," and "Nonproliferation construction" programs.  Ex. 14, 2017 CAA Explanatory Statement.

73.     Except for the amounts appropriated for MOX Facility construction, the 2017 CAA does not prohibit the utilization of the authorized and appropriated "Defense Nuclear Nonproliferation" funds for payment of the economic and impact assistance to the State required by Section 2566.

74.     In addition to the "Defense Nuclear Nonproliferation" appropriation account and its programs and subprograms, the 2017 CAA contains, also under the general heading of "Atomic Energy Defense Activities," the following "Defense Environmental Cleanup" appropriation account:

> For Department of Energy expenses, including the purchase, construction, and acquisition of plant and capital equipment and other expenses necessary for atomic energy defense environmental cleanup activities in carrying out the purposes of the Department of Energy Organization Act (42 U.S.C. 7101 et seq.), including the acquisition or condemnation of any real property or any facility or for plant or facility acquisition, construction, or expansion, and the purchase of not to exceed one fire apparatus pumper truck, one aerial lift truck, one refuse truck, and one semi-truck for replacement only, $5,405,000,000, to remain available until expended: *Provided*, That of such amount, $290,050,000 shall be available until September 30, 2018, for program direction: *Provided further*, That of the amount provided under this heading, $26,800,000 shall be available for the purpose of a payment by the Secretary of Energy to the State of New Mexico for road improvements in accordance with section 15(b) of the Waste Isolation Pilot Plant Land Withdrawal Act (Public Law 102–579): *Provided further*, That the amount made available by the previous proviso shall be separate from any appropriations of funds for the Waste Isolation Pilot Plant.

75.     Included within the "Defense Environmental Cleanup" appropriation account are appropriations for each of DOE's complexes and sites and their related programs, including SRS.

76.     The 2017 CAA does not prohibit the utilization of the authorized and appropriated "Defense Environmental Cleanup" funds for payment of the economic and impact assistance to the State required by Section 2566.

77.     Also contained within the 2017 CAA under the general heading of "Atomic Energy Defense Activities" is the following appropriation account for "Other Defense Activities":

> For Department of Energy expenses, including the purchase, construction, and acquisition of plant and capital equipment and other expenses, necessary for atomic energy defense, other defense activities, and classified activities, in carrying out the purposes of the Department of Energy Organization Act (42 U.S.C. 7101 et seq.), including the acquisition or condemnation of any real property or any facility or for plant or facility acquisition, construction, or expansion, $784,000,000, to remain available until expended: *Provided*, That of such amount, $254,230,000 shall be available until September 30, 2018, for program direction.

78.     The 2017 CAA does not prohibit the utilization of the authorized and appropriated "Other Defense Activities" funds for payment of the economic and impact assistance to the State required by Section 2566.

79.     Upon information and belief, in addition to the 2017 CAA appropriations, DOE had other available legally available appropriations for payment of the economic and impact assistance to the State required by Section 2566, including carryover funds from prior year appropriations, also known as "uncosted unencumbered balances," which generally remain available until expended.

80.     Despite having legally available appropriations, DOE has failed and refused to provide any of the economic and impact assistance payments to the State.

81.     DOE's failure to provide the economic and impact assistance payments to the State is a clear violation of Section 2566, and the State has been harmed by this failure.

82.    The State therefore is entitled to full payment of an amount equal to $1 million per day in economic and assistance payments owed for the first 100 days of 2017.

**PRAYER FOR RELIEF**

**WHEREFORE,** the State of South Carolina respectfully asks this Court to enter judgment in its favor and against Defendant and to:

A.    **Award the State of South Carolina monetary relief equal to the One Million Dollar ($1,000,000) per day economic and impact assistance payments that the State should have received for each of the first 100 days of calendar year 2016 pursuant to Section 2566(d)(1).**

B.    **Award the State of South Carolina monetary relief equal to the One Million Dollar ($1,000,000) per day economic and impact assistance payments that the State should have received for each of the first 100 days of calendar year 2017 pursuant to Section 2566(d)(1).**

C.    **To the extent available, award the State of South Carolina pre-judgment and post-judgment interest.**

D.    **To the extent available, award the State of South Carolina costs and attorneys' fees.**

E.    **Award the State of South Carolina such other and further relief as this Court may deem necessary and proper.**

Respectfully submitted,

Of Counsel:             Alan Wilson
Robert D. Cook
T. Parkin Hunter
**ATTORNEY GENERAL FOR**
**THE STATE OF SOUTH CAROLINA**
Post Office Box 11549
Columbia, South Carolina 29211-1549
awilson@scag.gov
bcook@scag.gov
phunter@scag.gov
Telephone: (803) 734-3970
Facsimile: (803) 734-3524

Attorney of Record:   s/Randolph R. Lowell
Randolph R. Lowell
Benjamin P. Mustian
John W. Roberts
**WILLOUGHBY & HOEFER, P.A.**
Post Office Box 8416
Columbia, South Carolina 29202-8416
rlowell@willoughbyhoefer.com
bmustian@willoughbyhoefer.com
jroberts@willoughbyhoefer.com
Telephone: (803) 252-3300
Facsimile: (803) 256-8062

Of Counsel:             Kenneth P. Woodington
**DAVIDSON, WREN & PHYLER, P.A.**
1611 Devonshire Drive, 2nd Floor
Post Office Box 8568
Columbia, South Carolina 29202-8568
kwoodington@dml-law.com
Telephone: (803) 806-8222

*Attorneys for the State of South Carolina*

March 6, 2018
Columbia, South Carolina

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on March 6, 2018, I electronically filed the foregoing AMENDED

COMPLAINT with the Clerk of the Court by using the CM/ECF system, which will send a notice

of electronic filing to all CM/ECF participants.

<u>s/Randolph R. Lowell</u>
Randolph R. Lowell
**WILLOUGHBY & HOEFER, P.A.**
Post Office Box 8416
Columbia, South Carolina 29202-8416
rlowell@willoughbyhoefer.com
Telephone: (803) 252-3300
Facsimile: (803) 256-8062

*Attorney of Record for the State of South Carolina*